WILMINGTON TRUST COMPANY, a corporation of the State of Delaware, in its separate corporate capacity and as Trustee under the Will of George P. McNear, Jr., Deceased, Third-Party Plaintiff and Cross-Defendant and Counter-Claim Defendant Below,
Appellant,

*vs.*

J. RUSSELL COULTER, Trustee under the Will of George P. McNear, Jr., Deceased, Third-Party Defendant and Cross-Claimant Below,
Appellee,

and

ELIZABETH M. McNEAR et al, Third-Party Defendants and Counter-Claimants Below,
Appellees.

*Supreme Court on Appeal February 11, 1964.*

*Reargument Denied May 7, 1964.*

*Robert H. Richards, Jr.*, and *Aaron Finger* (of Richards, Layton & Finger), Wilmington, and *William S. Potter* and *James L. Latchum* (of Berl, Potter & Anderson), Wilmington, for Wilmington Trust Co.

*Clair John Killoran* (of Killoran & VanBrunt), Wilmington, and *Stuart S. Ball, Richard J. Flynn, James G. Archer* (of Sidley,

Austin, Burgess & Smith), Chicago, Ill., for Elizabeth M. McNear and others.

*H. James Conaway, Jr.* (of Morford, Young & Conaway), Wilmington, and *Philip W. Tone* (of Thompson, Raymond, Mayer & Jenner), Chicago, Ill., for J. Russell Coulter.

TERRY, C. J., and WOLCOTT and CAREY, JJ., sitting.

WOLCOTT, Justice. This is an appeal by Wilmington Trust Company (Trust Company) in both its corporate capacity and as a Co-Trustee with Guy A. Gladson under the will of George P. McNear. The judgment appealed from surcharged the Trust Company in the amount of $500,000.00 with 4% interest from January 12, 1962. The surcharge has been made by reason of the payment of $500,000.00 from the trust estate for the settlement with Pennsylvania Company, a subsidiary of Pennsylvania Railroad Company (Pennsylvania), of a suit brought by it for the specific performance of an alleged contract of April 15, 1955 to purchase from the Co-Trustees 23,400 shares of stock of the Toledo, Peoria & Western Railroad Company (TP&W) held in the trust estate, or, in the alternative, for damages in the amount of $819,000.00 plus interest. The settlement agreement with Pennsylvania Company was entered into by the Trust Company, the successor individual Trustee, J. Russell Coulter, Gladson having resigned, and the beneficiaries of the trust under the will of George P. McNear without prejudice, however, to the right of the successor Co-Trustee and the beneficiaries to claims for surcharge pressed by them against the Trust Company.

The Chancellor held the Trust Company failed to exercise proper care and judgment, first, in negotiating the agreement of April 15 with Pennsylvania; second, in not withdrawing from that agreement when it could legally have done so and when it became apparent that the shares in question could be sold at a much higher price, and, third, in failing to notify its Co-Trustee, Gladson, after April 15 and prior to receipt of his necessary written consent to the agreement that a substantially higher price could be obtained for the shares from a different purchaser. As a result of the action, or failure of action of the Trust Company in these respects, the Chancellor held the trust estate was

under the necessity of compromising the claim of the Pennsylvania Company in the amount of $500,000.00, and that the Trust Company must accordingly reimburse the trust estate.

A full exposition of the facts of the litigation is to be found in the Chancellor's opinion, *Pennsylvania Company v. Wilmington Trust Company*, 40 *Del.Ch.* 567, 186 *A.2d* 751, to which we make reference, but we make a briefer statement.

The trust involved in this cause was created by the will of George P. McNear in 1947. The Trust Company and Guy A. Gladson on March 10, 1952 began serving as Trustees. By the terms of the will the Trust Company was authorized to take any action, including sale of assets, upon receipt of consent in writing of the Co-Trustee. Specifically the consent of the trust beneficiaries was not required to a sale of trust assets.

The principal asset of the trust was 82% of the stock of the TP&W. From March, 1947 to May, 1954 the affairs of the TP&W prospered with the Trust Company performing its duties with respect to it through one of its vice presidents, who served as a director and officer of the TP&W. In the Spring of 1954, however, the Trustees determined that it was advisable, in order to diversify the trust investments, to sell the trust's holding of TP&W stock if a satisfactory price could be obtained.

To accomplish this result the Trust Company and its Co-Trustee, Gladson, agreed upon a course of action designed to achieve this. Briefly, it was agreed that the Trustees would not actively enter into negotiations for a sale of the TP&W stock and would not engage in haggling over price. The Trustees would, however, consider any offer of purchase made to them and if they thought the offer sufficient they would sell, but they would not pursue the prospective purchaser in an attempt to get an increase in the offer.

The reasons which led the Trustees to decide on this course were, first, their belief, based upon expert advice, that an active campaign to sell the stock would have an adverse effect upon the morale of the Railroad's employees, and, second, while a sale did not require the approval of the trust beneficiaries, nevertheless they knew that certain

of the beneficiaries were opposed to any sale and would be distressed if they learned that such was contemplated.

In the Spring of 1954 it became apparent that the stock of TP&W was acquiring a special value, possibly over and above the value based on its earnings. This arose from the fact that TP&W is a so-called "bridge carrier", that is, a railroad, the major traffic of which neither originates nor terminates on its own line. The principal traffic feeders of TP&W were the Santa Fe on the west and the Pennsylvania on the east. It seems to appear, however, that neither of these feeder railroads of their own volition diverted traffic to TP&W which, on the contrary, actively solicited its traffic from individual shippers.

In 1954, one Heineman acquired control of the Minneapolis & St. Louis Railway Company (M&StL) and thereafter sought to acquire control of another railroad, the Monon, and of the TP&W for the purpose of linking them with M&StL to establish an "outer-outer belt" line to bypass the Chicago and St. Louis gateways through which a substantial portion of the east-west railroad traffic in the United States is routed, leading, in the belief of Heineman, to undue loss in shipping time. The establishment of such an "outer-outer belt" line posed a possibly serious threat to the position of other railroads engaged in east-west shipments, including the Santa Fe and the Pennsylvania.

It is thus apparent that TP&W by reason of Heineman's activity had acquired a special value, both to Heineman since it was an essential link in his plan, and to the Santa Fe and the Pennsylvania which had substantial interest in the maintenance of the Chicago and St. Louis gateways. Appreciation of this special value of TP&W in the Spring of 1954 does not, however, seem to have been realized by either the Trustees or by the Santa Fe and the Pennsylvania, perhaps because the first step in Heineman's plan, the acquisition of Monon, had been successfully kept under cover.

In June, 1954, Heineman made his first offer to the Trust Company. This was an unsolicited offer to purchase the TP&W stock at about $69.50 per share. The offer was made on the basis of $7\frac{1}{2}$ times 1963 earnings, which was well above the price-earnings ratio of other comparable railroad stocks. The Trustees consulted the beneficiaries

and received a mixed reaction. The Heineman offer of June, 1954 was therefore rejected.

Following the June, 1954 offer, the Trustees thereafter from time to time sounded out various beneficiaries of the trust with respect to the possibility of sale of the TP&W stock. The widow of the testator, who with her immediate family was the largest trust beneficiary, consistently opposed any sale because of a sentimental attachment to the TP&W, while the other beneficiaries looked with more favor on a sale. All were agreed, Trustees and beneficiaries, however, that no sale should be made unless the price was satisfactory.

Heineman, not discouraged by the refusal of his offer of June, 1954, continued persistently to try to get the Trustees to name a price. This, the Trustees as consistently refused to do, although they continually told Heineman that as Trustees they would feel obliged to consider any *bona fide* offer to purchase which was substantially more than the offer of June, 1954.

In September, 1954, Heineman made a second offer to purchase the TP&W stock at $80.55, subject to Interstate Commerce Commission and M&StL stockholder approval. Again the parties concerned were sounded out by the Trust Company. Gladson opposed the sale to Heineman by reason of a feeling of unfriendliness not related to the sale of stock. The testator's widow was still opposed, and suggested her share of the trust income be used to purchase the shares of TP&W allocable to the other beneficiaries in order to forestall pressure from them to sell. The remaining beneficiaries were apparently not adverse to a sale at a satisfactory price which one suggested to be $100 per share. The result was an abrupt rejection of the Heineman $80.55 offer by Gladson, the Co-Trustee. Heineman was advised, however, later than a suitable offer would still be considered.

Throughout the balance of the Fall of 1954, Heineman continued to urge the Trustees to set a price or to negotiate one. In November the Trust Company learned of another prospective purchaser interested in the stock at $90 to $100 per share. On December 28 Heineman informed the Trust Company that M&StL was prepared to buy for cash at a price higher than the offer of September, 1954 ($80.55) all of the

stock of TP&W, but in view of the rejection of the two prior offers he was not going to make the price specific until the Trustees had indicated a price or range of prices they would accept. He also requested a meeting with the Trustees for the purpose of discussing price. No immediate action by the Trustees was taken on Heinemans' request for a meeting.

Meanwhile, other matters had developed. Both Gladson and Coulter, who was the operating head of TP&W, had discussed the possibility of a sale of the TP&W stock to the Santa Fe with its president. It appeared that the Rock Island Railroad was opposed to the acquisition of the TP&W by the M&StL and would pay to prevent it, and the Pennsylvania's president had indicated that it would not be to the advantage of Pennsylvania to acquire TP&W. Accordingly, on January 26, 1955, the Trust Company notified Heineman that because there were other interested buyers it had become necessary to study the whole situation.

The Trust Company thereupon tried to fix a value on the TP&W stock. Its staff made two valuations, one of $115 and the other of $90 per share, though the latter was apparently on an assumption other than a sale by the Trustees. In addition, there was made available to the Trust Company a valuation report obtained by the widow fixing the value at $103 per share. There were also other indications of value. Heineman had offered to negotiate in excess of $80.55. One of the beneficiaries had proposed a sale at $100. A large stockholder of TP&W, Hanover Bank, expressed approval of a sale at $111, and two other parties were reportedly interested at a price less than $100.

By now the pressure upon the Trustees to sell had increased and, accordingly, in March the Trust Company and Gladson decided to canvass other railroads as well as Heineman to determine the top price that could be obtained for the TP&W stock, and to accept that price if it was satisfactory, or if it turned out to be unsatisfactory, to inform all interested parties finally that they had decided not to sell. This, they proceeded to do.

The result of the canvas was that Heineman offered to negotiate in a price range of $85.50 to $99, although stating at the time that he

was sure the M&StL would pay more than any other railroad. As far as the other possibly interested railroads were concerned, the prospective purchasers were narrowed to the Santa Fe and the Pennsylvania. By March 18 it was known that these two railroads were considering making a joint purchase offer. Ultimately it became apparent that the joint offer would be for sufficient of the trust's stock to make up 52% of all the TP&W stock, thus leaving the Trustees holding 30% of the stock in a locked-in minority position.

Over a period of days the Trustees considered what should be done. It was apparently finally decided that the most desirable purchasers of the stock were the Santa Fe and the Pennsylvania. This decision was reached for several reasons. First, the location of these two railroads at either end of the TP&W might have possible adverse effects upon it if it fell into hands unfriendly to the Santa Fe and the Pennsylvania. Second, the trust's minority interest in the TP&W would be protected by an operating agreement and the investment might well increase in value if the Santa Fe and the Pennsylvania took steps to protect their investment in TP&W. Third, the Trustees had been advised by Coulter that approval of a purchase by Heineman by the I.C.C. was "by no means assured." Fourth, the testator's widow and largest trust beneficiary was unyieldingly opposed to a sale to Heineman and threatened to appear before the I.C.C. in opposition to any such sale. Fifth, the Santa Fe and the Pennsylvania let it be known that they, too, would oppose approval of a sale to Heineman before the I.C.C.

On April 15 representatives of the Trust Company met with representatives of the Santa Fe and the Pennsylvania. Prior to this meeting the Trust Company had been called by Gladson and instructed not to sell the stock down to a minority position. The negotiation thus stalled over the insistence by the Trust Company that the railroads purchase all of the trust's 82% of the TP&W stock, and the equally insistent refusal by the railroads to purchase more than 52% of all the stock. At this point the president of the Pennsylvania called Coulter, apparently without the knowledge of the Trust Company's representatives, who in turn called Gladson and told him of the stalemate. Gladson then telephoned one of the Trust Company's representatives in

Philadelphia and said he would agree to a sale of only 52%. Thereupon, agreement was reached for the sale of 52% at $100 per share. Parenthetically it may be noted, the Trust Company's representatives had tried unsuccessfully to obtain a higher price.

On the same day, April 15, the agreement thus reached was reduced to writing in the form of a letter which was signed by representatives of the railroads and of the Trust Company. The letter agreement was made expressly subject to the approval of the Boards of the purchasing railroads and the I.C.C. No particular provisions for the protection of the trust's minority interest were included, except that it was agreed that TP&W would continue to operate as an independent organization with the provision to be implemented by a formal contract to be worked out by counsel. April 15 fell on a Friday and by Monday, April 18, all parties interested in the trust had been told of the agreement to sell 52% of the stock at $100 per share. No one raised any objection.

Meanwhile, on April 15 counsel in Wilmington for Heineman had been seeking to get in touch with the Trust Company's representatives, then in Philadelphia, to arrange a meeting between them and Heineman. On Monday, April 18, Heineman's counsel was informed that the TP&W stock had been disposed of and that Heineman was "out". Later the same day, on Heineman's instruction, his counsel informed the Trust Company that Heineman would either buy, lease or bid competitively for the TP&W, and that the M&StL would pay more than any other bidder. This oral offer was followed on the next day by a written offer by Heineman to pay 5% more than the amount the Trustees had already agreed to accept. In addition to the Trust Company, Heineman communicated this offer to the beneficiaries of the trust, some of whom at least informed the Trust Company that they preferred to abide by the agreement concluded with the Santa Fe and the Pennsylvania.

On April 22 Heineman made an offer to the Trust Company to buy all of the trust's TP&W stock at $133.33 per share, subject to M&StL stockholder and I.C.C. approval, and provided the Trustees could escape from their agreement of April 15. At this time, April 22, the Boards of the purchasing railroads had not approved the agree-

ment, one of its conditions, nor had the Trust Company received Gladson's written consent to the sale required by the will of McNear. Presumably, therefore, the Trust Company could have withdrawn from the April 15 agreement with impunity.

Thereafter, the Trust Company did not inform Gladson, its Co-Trustee, of the latest Heineman offer, although a telephone conversation was had with him on April 25 with respect to the proposed protective provision to be included in the formal contract with Santa Fe and Pennsylvania. On April 27 the Board of Pennsylvania formally approved the agreement and the Trust Company had by that time received Gladson's written consent to the sale. It is tacitly conceded that the Trust Company could with impunity have withdrawn from the April 15 agreement at any time during the period April 15 to April 27, either for the failure of the Pennsylvania Board to act or the failure to receive the written consent of its Co-Trustee. This, however, the Trust Company did not do. It did not withdraw until forced to do so by pressure put upon it by the beneficiaries.

Thereafter, Heineman communicated his offer to all the beneficiaries of the trust who immediately put pressure on the Trust Company to withdraw from the April 15 agreement and to accept Heineman's offer. Finally, on May 26, counsel for the Trust Company advised it that the April 15 agreement was not legally binding upon it and the Trust Company agreed to accept Heineman's offer unless a better offer was forthcoming. Santa Fe and Pennsylvania were so informed and the upshot was that Santa Fe purchased all of the trust's TP&W stock at $135 per share. Subsequently, Santa Fe sold one-half of this stock to Pennsylvania at the same price, which thereupon instituted suit against the Trustees to enforce the agreement of April 15. This action was later settled by the payment to Pennsylvania of $500,000.00 in settlement of its claim for $819,000.00.

Upon the foregoing facts, more fully stated in his opinion, the Chancellor surcharged the Trust Company for breach of trust arising from its negligent performance of its duties as Trustee. Whether or not the Trust Company was negligent depends directly upon whether or not its actions constitute a departure from the standard of care

required of Trustees in the performance of their duties. In the light of this standard the action of the Trust Company is to be tested.

The investment standards and powers of Trustees are laid down in 12 *Del.C.* § 3302 in the following language:

> "In acquiring, investing, reinvesting, exchanging, retaining, selling and managing property for the benefit of another, fiduiciaries shall exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital."

The Chancellor construed the quoted statute when the question is the sale of trust assets as requiring something more than an honest opinion or good faith business judgment on the part of the Trustee. He held that the statute requires a Trustee to act "as other reasonable businessmen would have acted upon the same circumstances."

The standard of care laid down by the Chancellor is attacked as incomplete by the Trust Company on the ground that it leaves out an additional element, viz., an overriding requirement that the trust property be conserved. It is argued that a Trustee is held to a higher standard of care than an ordinary reasonable businessman because a Trustee is prohibited from taking business risks which possibly might endanger the integrity of the trust assets even though such risks might justifiably be taken by one dealing with his own property.

We do not think it so clear that the Chancellor ignored the element of safety of corpus the Trust Company says must be included in the definition, but in any event we agree that the element of conservation of the trust estate is a necessary part of the standard of care required of all Trustees.

The quoted statute must be read in the light of In re *Cook's Trust Estate*, 20 *Del.Ch.* 123, 171 *A.* 730. As a matter of fact, we consider the statute to be declaratory of the principles laid down in

the case decided prior in time to the enactment of the statute in its present form. To be sure, the case dealt with an attempt to surcharge a Trustee for an improper investment but we conceive of no difference in principle between investing trust moneys and in selling trust assets. We are of the opinion that the case is equally applicable to both situations and thus is applicable in the case at bar.

In Cook's Trust Estate it was laid down that, generally speaking, a Trustee's duty to his trust and to his beneficiaries in administering the trust is to exercise the care and skill a man of ordinary prudence would exercise in dealing with his own property in the light of the situation existing at the time. The conduct of the Trustee is not to be judged by hindsight knowledge of subsequently developed facts and circumstances.

The general rule, however, has two additional qualifications when the precise question is the approval of investments or the sale of trust assets. The first of these qualifications is that the standard of an ordinarily prudent person dealing with his own property is subjected to the additional burden that he is dealing with the property of others for whom he feels morally bound to provide. Accordingly, a Trustee is not permitted to take risks with the trust property which possibly a man dealing with his own property would consider to be warranted under the circumstances if to do so endangers the trust estate. Secondly, in administering a trust, the Trustee is bound always to the primary objective of assuring the safety of the trust assets. He may take no risk which endangers the integrity of the trust corpus.

While ordinarily speaking, when selling trust assets a Trustee is required to obtain the best price obtainable, he necessarily, however, must do so in the light of the overriding consideration of safety of the trust assets. Thus, it is, we conceive, that under some circumstances a Trusteee is not negligent in accepting the lower of two offers when the higher offer is of such character as to justify the belief that its consummation is doubtful, and that the refusal of the lower offer would damage the trust. *Bogert, Trusts and Trustees* (2nd Ed.), § 745; *Dombey & Rindsfoos,* 105 *Ohio App.* 335, 151 *N.E.2d* 563; In re *Koos' Estate,* 269 *Wis.* 478, 69 *N.W.2d* 598; *Webb & Knapp, Inc. v. Hanover Bank,* 214 *Md.* 230, 133 *A.2d* 450. When all is equal,

however, it is plain that the Trustee is bound to obtain the best price obtainable. *Buttle v. Saunders* (1950) *2 L.R.* 193; *Heilig Bros. Co. v. Kohler,* 366 *Pa.* 72, 76 *A.2d* 613.

The Trust Company argues that the Chanceller failed to give consideration to the rule that above all a Trustee must act so as to preserve the trust estate, and that his finding that the Trust Company was negligent is explainable solely by reason of this fact. We think the Trust Company misconceives the nature of the Chancellor's holding but, in any event, we propose to examine for ourselves the conclusion that in three respects the Trust Company must be found to have been negligent.

Initially, the Trust Company has been held negligent in negotiating the April 15 agreement. We think the Chancellor so held and we think his holding was based upon a conclusion that the Trust Company should have known on April 15, prior to its entry into the agreement of that date, that the top price obtainable for the TP&W stock had not been obtained. Whether or not this is a proper conclusion must be determined in the light of the facts as known to the Trust Company on April 15.

What are these facts? Over a course of months Heineman in behalf of the M&StL had twice made an offer for the purchase of the TP&W stock. His original offer was approximately $69.50 per share. This offer was first made in June, 1954, and in the following September it was raised to $80.55 per share. The Trustees considered a proper course of action for them to take and concluded that the Santa Fe and the Pennsylvania should be sounded out to see if they were possible purchasers. Coulter, the operating head of TP&W, advised that approval by the I.C.C. of the purchase by Heineman was by no means assured.

In the meantime, the Trust Company had other indications of value of the stock. A report based on a comparison of the TP&W with other "bridge" railroads valued the stock at $115 per share. In another unrelated connection the Trust Company had its own staff value the stock which worked out to approximately $90 per share. In addition, the Trust Company became familiar with a value report made at

the request of the widow of the testator which valued the stock within a range of $78 to $103 per share. One of the beneficiaries had recommended a sale at $100, and the representative of Hanover Bank, a large stockholder of TP&W, had stated a sale at $111 per share would be approved. Two other possible purchasers were rumored to be interested in purchasing the shares at less than $100. Gladson, the Co-Trustee of the Trust Company, at one time refused to permit a counteroffer to Heineman of $100.

Under the circumstances as then apparent to the Trust Company, we think it cannot be said that the Trust Company was imprudent in assuming as of that time that the top price obtainable for the TP&W stock was $100. There might well have been a difference of opinion among responsible businessmen under similar circumstances but, certainly, it was as justified to assume a value of $100 per share as it would have been justified to assume the contrary. The problem, we think, fell within the realm of business judgment and, under such circumstances, a court may not substitute its business judgment for that of the Trustee.

To be sure, the agreement of April 15 did not sell all of the TP&W stock held in the trust, but retained in the hands of the Trustee a 30% interest in the TP&W. We think, however, it cannot be said that this was an imprudent act on the part of the Trust Company. First, it is to be noted that the April 15 agreement specifically required the working out of a formal contract for the operation of the TP&W in a way which would protect the 30% minority interest remaining in the trust. In addition, it appears that there was some expression of opinion to the effect that the retention of a 30% minority interest in the TP&W by the Trustee might well prove beneficial because of the purchase of control of the TP&W by the Pennsylvania and the Santa Fe, the connecting railroads at either end of the TP&W line, and their desire to protect their investment. Obviously, if a satisfactory protective agreement could not have been worked out, the trust was not bound to sell the control of the TP&W.

Furthermore, it seems clear that it was believed that if the Santa Fe and the Pennsylvania opposed a sale to Heineman before the I.C.C., approval would be delayed for a long period of time, if not actually

withheld. During this period of delay the operation of TP&W might be adversely affected, thus directly injuring the trust of which it was the major asset. Under the circumstances, we think this fear not unfounded in fact.

The Trust Company representatives went to the meeting in Philadelphia on April 15 instructed by their Co-Trustee, Gladson, not to sell less than all of the TP&W stock held in the trust. When it became apparent that agreement could not be reached on this basis, the Pennsylvania representative, unknown to the Trust Company, called Coulter, the president of TP&W upon whose advice the Trust Company relied, and told him of the stalemate. Coulter in turn called Gladson who thereupon telephoned one of the Trust Company's representatives and agreed to a sale of less than all of the Trust Company's TP&W stock. We think it fair to say that it is obvious that but for this call from Gladson there would have been no April 15 agreement because of the refusal of the Santa Fe and the Pennsylvania to purchase all of the trust's stock.

We conclude, therefore, that the facts and circumstances known to the Trust Company prior to and on April 15 justified its decision to sell to the Santa Fe and the Pennsylvania, and not to pursue further the possibility of selling to Heineman. There is perhaps room for disagreement on this conclusion, but the decision was at most debatable and called for the exercise of business judgment. Under such circumstances, a *bona fide* exercise of judgment, based on fact, may not be disturbed. We cannot avoid a feeling that the Trust Company's action on April 15 is attacked as improvident because of later developments, but this may not be done. Its conduct is to be judged in terms of the facts as they were known on April 15 and not in terms of later developments which, apparently, took all concerned by surprise.

The second charge of negligence against the Trust Company is that, after having entered into the April 15 agreement, it was negligent in not withdrawing from that agreement at a time when it could with impunity have done so.

It will be recalled that immediately upon learning that an agreement had been reached between the Trust Company and an undisclosed

purchaser, Heineman offered to buy all of the trust's stock at a 5% increase. This offer was communicated by Heineman not only to the Trust Company but to the beneficiaries of the trust. As far as the record shows, all were agreed that this offer should be rejected.

On April 22, Heineman increased his offer to purchase all of the trust's TP&W stock at a price of $133.33 per share. This offer was made prior to the ratification of the April 15 agreement by the Boards of the purchasers on April 27 and, also, prior to the receipt by the Trust Company of the written consent of Gladson, the Co-Trustee, an act required by the will creating the trust. The Chancellor held that the receipt of this additional offer, of itself, should have caused the Trust Company to withdraw, which it then could do from the April 15 agreement.

However, the Trust Company did not withdraw. It argues that its refusal to withdraw was justified under the circumstances because of its belief that I.C.C. approval of a sale to Heineman would be extremely difficult to obtain or, if approval was obtained, the opposition of Pennsylvania and Santa Fe would long delay that approval, and in the interim Pennsylvania and Santa Fe, connecting at each end of the TP&W line, could materially affect the prosperity of the TP&W.

The Trust Company also argues that if it had withdrawn from the April 15 agreement before April 27, it would have invited the very litigation which came to pass. Indeed, this seems probable since the Pennsylvania at all times has insisted that the April 15 agreement was a binding commitment. As a matter of fact, the binding nature of the April 15 agreement, even after the Board approval of April 27, has never been adjudicated. This is made clear by *Wilmington Trust Co. v. Pennsylvania Company*, 40 *Del.Ch.* 1, 172 *A.2d* 63, the decision in the first appeal expressly refusing to pass upon the question because it had not been decided below. It was after this decision that the parties settled the claim of the Pennsylvania based upon the April 15 agreement. Nevertheless, it does seem apparent that withdrawal of the Trust Company prior to April 27 would at the least have given it an additional defense to the Pennsylvania's claim.

The Trust Company argues further that it would have been an improvident act for it to have withdrawn from a certain sale to the Santa Fe and the Pennsylvania in order to attempt to consummate a sale with Heineman at a higher price. They point to the fact that the Heineman offer was an oral one to the effect that he would recommend a purchase to his Board of Directors, and that the shortness of time prevented the receipt by it of a formal offer from M&StL. This, we think, however, begs the issue for the Trust Company should have realized from the events of the past that Heineman, in the interest of M&StL, was a serious bidder for the TP&W stock. Furthermore, the situation with respect to Heineman was not dissimilar from that with respect to the representatives of the Santa Fe and the Pennsylvania who, likewise, could not act finally without Directors' approval to be obtained at a subsequent time.

In addition, the Trust Company argues that the same facts and circumstances which had caused it initially to decide to sell to the Santa Fe and the Pennsylvania were still live, and justified its decision to adhere to the April 15 agreement. This would seem to be so except for one important change—the matter of price. On April 15 the Trust Company was perhaps justified in assuming the top obtainable price was $100 per share, but the Heineman offer of April 22 of $133.33 threw grave doubt on the validity of this assumption.

The Chancellor rejected the contention of the Trust Company that it should not have withdrawn prior to April 27. We think, however, that it is not altogether clear that the Trust Company's contention is wholly without merit. Again, whatever decision was to be made of necessity had to be based on sound business judgment. It cannot be said that the Trust Company's fears of adverse effects flowing from a withdrawal are completely groundless. Resolving the question is a difficult one.

However, we do not have to resolve the question. We do not have to do so because the Trust Company failed to communicate the $133.33 offer to its Co-Trustee, Gladson, although that offer was received prior to the receipt by the Trust Company of Gladson's written consent.

What Gladson's reaction to receipt of notice of this offer might have been, we cannot tell. The Trust Company argues that his subsequent acts indicate that he would have agreed that the offer should be rejected. But, it would seem to be pertinent that when Gladson did learn of the offer after April 27 he demanded an explanation of the Trust Company of its failure to notify him. However, unfortunately, at the trial Gladson was incapacitated to testify and no one can know what his reaction would have been. In any event, however, the Trust Company, by its failure to notify him of Heineman's final offer, effectively prevented any action on his part with respect to it. This, we think, was a clear breach of the duty existing between Co-Trustees to inform each other of pertinent facts relating to the administration of the trust. II *Scott on Trusts (2d Ed.)*, § 184.

The situation, therefore, resolves itself to the fact that failure to withdraw prior to April 27 has caused a loss to the trust by the payment of damages resulting from the subsequent withdrawal. In the absence of proof to the contrary, it must be assumed that Gladson would have withheld his consent to the April 15 agreement, an act required by the will to permit the Trustees to act, if the Trust Company had notified him as it was bound to do. Since the loss to the trust was caused by the failure to withdraw, it follows that the Trust Company must be held responsible since its failure to notify Gladson insured that there would be no timely withdrawal.

The Trust Company must therefore reimburse the trust estate for the loss occasioned by it. The question remains, however, in what amount shall this reimbursement be? The Chancellor surcharged the Trust Company in the amount of $500,000.00 on the theory that it was responsible for everything the trust had to pay to settle the litigation caused by its negligence. The Trust Company argues, however, that if it is to be surcharged it is entitled to a credit represented by the increase in price actually received over the Heineman offer of $133.33, an increase in price due solely to the efforts of the Trust Company.

The matter arose thus. Following the failure of the Trust Company to withdraw from the April 15 agreement, mounting pressure was put on it to withdraw and accept the Heineman offer. It finally

did withdraw but before accepting the Heineman offer made one last attempt with the Santa Fe and the Pennsylvania to better the Heineman offer. The Pennsylvania refused but the Santa Fe offered $135 per share for all the TP&W stock held in the trust. The Trust Company now claims it should be credited with the additional $1.67 per share it brought into the trust estate. This amounts to the total sum of $123,146.00.

■ We are of the opinion, however, that no credit should be allowed. The Trust Company has been held to have breached the trust as a result of which it became necessary to settle the claim of the Pennsylvania by the payment of $500,000.00 from the assets of the trust. To this extent, therefore, the trust has been diminished. This is the loss to the trust resulting from the breach of trust for which the Trust Company is liable. *Restatement of Trusts 2nd,* § 205.

The argument for the allowance of the credit depends directly on the proposition that the breach of trust was the failure to accept the Heineman offer of April 22. But this is not what the Trust Company is charged with. Its breach of trust consists of its failure to notify its Co-Trustee of the higher offer at a time when he could have withheld his consent, thus preventing the possibility that he would have withheld his consent.

By reason of the failure to withdraw, it became necessary to pay $500,000.00. This necessity was caused by the Trust Company which therefore must reimburse the trust estate.

For the foregoing reasons the judgment of the Chancellor is affirmed.

## On Petition for Reargument.

WOLCOTT, Justice: Following the filing of the opinion in this cause the Trust Company filed a petition for reargument. The burden of the petition is that we committed error in finding negligence on the part of the Trust Company because of its failure to notify Gladson, its Co-Trustee, of the fact of the Heineman offer of April 22. Particularly attacked is our statement that it must be "assumed" that Gladson would have withheld his consent if he had been notified of the offer.

On reflection we regard the complained-of assumption as an unfortunate overstatement of our view of the matter. It is, of course, true that it is now impossible to determine what reaction Gladson might have had. It does seem significant to us, however, that when he did finally learn of the offer, after the ratification by Pennsylvania's Board, he demanded an explanation of the failure to notify him. It was only after he had been told that the Heineman offer of April 22 was not any offer at all that he was mollified and thereafter cooperated in trying to work out the details of the operating agreement required by the April 15 agreement. Regardless of any assumption as to what Gladson would or would not have done had he known in time of the April 22 offer, the fact is that his subsequent action was taken in ignorance of that offer.

In any event, however, the Trust Company is in error in arguing that our decision was based exclusively upon its failure to notify Gladson. This failure, of course, supplies one reason but, in addition, the Trust Company, itself, upon the receipt of Heineman's offer of April 22 should have reconsidered the sale to Pennsylvania and Santa Fe. An increase of 33⅓% in the prospective price, we think, was of sufficient moment to require a reconsideration by it, and a full disclosure and discussion with the Co-Trustee. Particularly is this so when, as far as the Trust Company knew, the Pennsylvania and Santa Fe Boards had not acted to approve the April 15 agreement.

At the very least, it seems to us, the appreciably higher offer should have caused the Trust Company to go back to the Pennsylvania and Santa Fe, as it finally did, and try to negotiate a higher price from them. Certainly, on April 22 the Trust Company was in a better position to do this than it was after the formal acts of approval by the Pennsylvania and Santa Fe had closed the door on one possible defense, that of withdrawal prior to ratification.

The Trust Company argues, however, that it could not have withdrawn from the April 15 agreement at any time without subjecting itself to the possibility of suit. It is, of course, obvious that the Pennsylvania and Santa Fe could not have been prevented from suing because of a withdrawal, but that is not the point. The point is that, prior to April 27 and the ratification by the Boards of Santa Fe and

the Pennsylvania, the Trust Company would have had available the possible defense to such a suit of the nonexistence of a binding contract.

 The Trust Company objects to our statement that its right to withdraw prior to April 27 was tacitly conceded. We made this statement advisedly for the reason that such a tacit concession was made in the proceedings below. For the first time in the entire course of this litigation the argument was made in this court that the letter of April 15 constituted a binding commitment on April 15. Since it was raised before us for the first time, and since it is a departure from the Trust Company's position below, we could justifiably not consider it. *Equitable Trust Co. v. Gallagher*, 32 *Del.Ch.* 401, 77 *A.2d* 550; *Stephenson v. Commonwealth & Southern Corp.*, 19 *Del.Ch.* 447, 168 *A.* 211. However, we will note briefly the argument that the April 15 agreement was a binding commitment on that date.

It is asserted that the April 15 agreement was binding and valid under Pennsylvania law, held in *Wilmington Trust Co. v. Pennsylvania Company*, 40 *Del.Ch.* 1, 172 *A.2d* 63, to be applicable to the agreement. In the briefs, however, the proposition is not stated so baldly. The argument made in them is simply that the Chancellor assumed eroneously that Pennsylvania would have acquiesced in the withdrawal prior to April 27, and that there would have been no lawsuit. Such, however, is not the fact. No such assumption was made. The assumption was merely that if the Trust Company had withdrawn it would have had a valid defense to an action for breach if such an action were instituted by Pennsylvania.

The Trust Company argues, nevertheless, that it was bound by the April 15 agreement which it describes as in the nature of an option held by Pennsylvania pending action by its Board of Directors, the consideration for which was the obligation assumed by Pennsylvania to submit the agreement to its Board. It is described as a bilateral executory contract for future performance subject to a condition precedent to an immediate obligation to perform.

In support of the argument is cited 3*A Corbin on Contracts* (1960 Ed.) § 626, which cites as illustrative the prior decision of the Chancellor in the first round of this litigation, *Pennsylvania Co. v. Wil-*

*mington Trust Co.,* 39 *Del.Ch.* 453, 166 *A.2d* 726, in which it was held that Pennsylvania law was applicable to the April 15 agreement. It is quite apparent, however, that both the Chancellor and Corbin in referring to the condition precedent to an immediate obligation to perform were referring to the necessity of I.C.C. approval and to the working out of a satisfactory agreement for the operation of the TP&W. The principle did not come into operation until after the approval of the agreement by Pennsylvania Board.

The Trust Company argues, however, that the April 15 letter was at least a binding option to hold the offer open until Pennsylvania's Board had time to act. The general rule, however, is that a general power to sell trust assets given a trustee does not ordinarily include within it the power to grant options for the sale of trust property, absent a showing that only by the granting of an option may a sale be advantageously made. *Equitable Trust Co. v. Delaware Trust Co.,* 30 *Del.Ch.* 118, 54 *A.2d* 733; II *Scott on Trusts* (*2nd Ed.*) § 190.8. We are of the opinion that there is nothing in this record to demonstrate the necessity of granting an option in order to effect an advantageous sale.

The Trust Company argues further, since the April 15 agreement is governed by Pennsylvania law, that § 2–205 of the Pennsylvania Commercial Code (12A Purdon's Pennsylvania Statutes Annotated, § 2–205) made the April 15 letter a binding offer irrevocable for a reasonable period of time not exceeding three months, and that, thus, the Trust Company was not free to withdraw. § 2–205 is as follows:

> "An offer by a merchant to buy or sell goods in a signed writing which gives assurance that it will be held open needs no consideration to be irrevocable for a reasonable time or during a stated time but in no event for a time exceeding three months; * *."

We think § 2–205 is inapplicable to the April 15 agreement. First, the section in terms applies only to merchants; second, the Trust Company, in the absence of the written consent of Gladson, could not alone make a firm offer to sell; third, under general trust law, absent particular circumstances, a trustee with general power to sell is not empowered to option trust property, and, fourth, the April 15 agree-

ment contains no assurance by the Trust Company that its offer, if it be an offer, would be held open. See also *McCrea v. Automatic Heat,* 161 *Pa.Super.* 545, 55*A.2d* 564, a decision of the Pennsylvania Superior Court, to the effect that an order requiring confirmation by an officer of a seller is not a binding contract until so confirmed.

It therefore follows that the Trust Company from April 15 to April 27 was not bound to a valid contract but could have withdrawn from any commitment during that period, if not with impunity against suit, certainly with impunity against liability for breach of contract. Nevertheless, it did not withdraw nor, so far as the record shows, was there any consideration given to the possibility of withdrawal or an attempt to negotiate a higher price from the Pennsylvania and the Santa Fe. Certainly, the least to be expected of a trustee under the circumstances was that it would seek the advice of its counsel to determine the possibilities inherent in the situation. This, however, was not done. The entire matter was considered to be a closed book.

We think, therefore, it was improvident of the Trust Company to ignore the Heineman offer of April 22. It should at least have re-examined the situation and obtained the advice of counsel as to what, if anything, it could do to improve the return to the trust. As we have pointed out, it was extremely doubtful that the trust had been irrevocably committed to anything by April 22, yet the Trust Company elected to so conclude with no attempt to explore the possibilities.

Furthermore, Gladson, the Co-Trustee, remained in ignorance of the new development until such time as the rights and liabilities of the parties had changed, for it seems clear to us that after the approval of Pennsylvania's Board the April 15 agreement took on an entirely different aspect by reason of § 2–204 of the Pennsylvania Commercial Code which provides that a contract will not fail for indefiniteness if there is a reasonably certain basis for giving an appropriate remedy.

Thus it is that the failure of the Trust Company to pursue the Heineman offer of April 22, and its failure to notify its Co-Trustee combined to require the settlement of the action subsequently brought by the Pennsylvania Company for which it must now be surcharged.

For the foregoing reasons the petition for reargument is denied.