W. Henry DuPONT, Appellant,

v.

DELAWARE TRUST COMPANY et al.,
Appellees.

Supreme Court of Delaware.

April 16, 1974.

Reargument Denied May 13, 1974.

William E. Taylor, Jr., Wilmington, Marvin Comisky, Morris L. Weisberg, Alan C. Gershenson, of Blank, Rome, Klaus & Comisky, Philadelphia, Pa., of counsel, for appellant.

William S. Potter, Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington; for appellees, V. R. Shackelford Jr., Shackelford & Robertson, Orange, Va., of counsel, for appellee, Marion duPont Scott.

CAREY, Justice, and TAYLOR and WALSH, Judges, sitting.

WALSH, Judge:

This is an appeal from a Court of Chancery determination that the Delaware Trust Company (Delaware Trust) did not breach its fiduciary duty as trustee under the Last Will and Testament of William DuPont, Senior. The appellant, and plaintiff below, is one of the five grandchildren of the testator. His brothers and sisters intervened in the Court of Chancery to support the position of Delaware Trust and the other original defendant, Hopeton Holding Company, a Delaware corporation.

At the time of his death on January 20, 1928, William DuPont, Sr. owned 58.35 percent of the 10,000 shares outstanding of Delaware Trust, as part of a total estate of approximately $40,000,000. His Will, executed 17 days earlier, provided for immediate distribution of certain assets to his son, William DuPont, Jr. (William) and his daughter, Marion DuPont Scott (Marion) but left the bulk of his estate, including the Delaware Trust shares, in a residuary trust with Delaware Trust as sole trustee as well as Executor. After payment of certain annuities to other relatives, the trustee was directed to distribute the net income of the trust to testator's son and daughter during their lives—sixty percent to William and forty percent to Marion. Upon the death of each life tenant the respective portion of the trust principal was to be distributed "in equal shares, to and among all my grandchildren who may then be living and the issue then living of any deceased grandchildren of mine . . ."

ITEM NINE of the Will, a provision which looms large in this litigation, provides: "My said Trustee in making investments hereunder shall be limited to securities deemed to be legal investments for trust funds". Additional provisions gave the Trustee broad discretion to sell and reinvest trust principal, with the direction to keep the principal "closely invested", "to consult my children respecting investments", and to retain investments held by the testator during his lifetime.

Immediately after William DuPont, Sr.'s death it became apparent that Delaware Trust's position as Trustee-Executor presaged difficulty. To begin with, the Will contained no dispensation of surety on the executor's bond and the bank's $10,000,000 in current assets were hardly sufficient to secure an estate of four times that amount. William and his sister promptly filed a petition with the Register of Wills to increase the Executor's bond to equal the estate assets. Shortly thereafter, the bank's Board of Directors was called to a special meeting to discuss a second problem—the prospect of Delaware Trust as Trustee holding legal title, and thus voting authority, to a majority of its own stock. The Board was advised by legal counsel that "it could not consistently vote its own stock, especially where such vote constituted the control". A solution to the bank's dilemma came in the form of a proposal by the two life tenants—William and Marion—that the 5,825 shares of Delaware Trust stock be exchanged for an equal number of nonvoting common shares of a new corporation to be formed by the life tenants to be known as Hopeton Holding Company (Hopeton). The voting control of Hopeton (and of Delaware Trust) would be represented by ten shares of preferred stock to be owned by William and Marion. This

arrangement, the so-called Hopeton exchange, had the effect of divorcing beneficial ownership from voting rights and permitted Delaware Trust to realize substantial commissions from its role as Executor-Trustee while being disentangled from the problem of voting its own shares. The life tenants then promptly withdrew their petition before the Register of Wills and exercised voting control through the Hopeton preferred to replace the existing Delaware Trust management as a result of which William became President of Delaware Trust, an office he held until his death in 1965. As part of the exchange, the two life tenants also executed an indemnity bond in the amount of $900,000 in favor of the trustee, to hold it harmless from any claims arising out of the transaction.

From 1928 to 1954, the Hopeton exchange permitted William to exercise control of Delaware Trust[1] while at the same time insuring that he and his sister would receive all dividends on the Delaware Trust stock owned by Hopeton by means of an almost total pass-through of Hopeton income to the trust.[2] In 1954, William created a revocable inter-vivos trust to which he transferred the ten voting shares of Hopeton. The trustees were himself, his sister, his daughter Jean, and his attorney. The trust is to continue until 20 years after the death of certain of his grandchildren unless terminated earlier by the trustees. Upon termination, the trustees are required to deliver the Hopeton voting shares free of trust "unto such of the trustor's descendants then living as a majority of the acting trustees, in their uncontrolled discretion, shall deem to be best qualified to receive and administer the assets then comprising the trust fund".

At William's death in 1965, the 60 percent share of his father's residual trust from which he had received the net income was distributed to his five children including the appellant. The remaining 40 percent continues in trust for the benefit of Marion who is 79 years of age. Among the assets distributed to William's children were aliquot shares of the non-voting common of Hopeton. They did not receive any preferred shares of Hopeton since this stock continues to be held by the surviving trustees of the 1954 inter-vivos trust who through it control Delaware Trust.

Since the Hopeton exchange, the Hopeton common shares held by the trustee have increased 20 fold by reason of stock splits of the underlying Delaware Trust shares and have earned dividends in excess of $2.3 million. During the same period Delaware Trust has realized almost $6 million in executor-trustee's commissions which have, in part at least, inured to the benefit of the trust.

In 1972 appellant filed an action in the Court of Chancery charging that the transaction between Delaware Trust and Hopeton was in violation of the testamentary trust established by the Will of William DuPont, Sr. and appellant, as a remainderman, was thereby deprived of his right to voting stock in Delaware Trust. He sought to require the delivery of voting shares of Delaware Trust proportionate to the 699 shares of Hopeton non-voting shares he presently holds. He also seeks removal of the trustee. As previously noted, the other four remaindermen and the surviving life tenant, Marion, intervened in the Court of Chancery in defense of the Hopeton exchange. The original defendants denied any impropriety and asserted affirmative defenses of laches, waiver and estoppel. After extensive discovery, all defendants moved for summary judgment on the legality of the Hopeton exchange while appellant moved for summary judgment on

---

1. Marion DuPont Scott transferred her four shares of voting preferred to her brother. At all times she relied on her brother for control and direction of her life interest in their father's estate.

2. The sole asset of Hopeton has been the Delaware Trust stock. All income from that stock, less minimal expenses, has been distributed to the Hopeton common stockholders.

both the complaint and the affirmative defenses. The Vice Chancellor ruled in favor of the defendants and this appeal followed.

In the Court of Chancery, and in this Court, appellant asserted that the Hopeton exchange constituted a clear violation of the testator's direction to limit trust investments to "legals only". Moreover, argues the appellant, the exchange was motivated by the desire of the life tenant, William, to control Delaware Trust for his advantage and the Trustee's participation in that arrangement constituted a preference for the interest of life tenants over that of the remaindermen.

Under ITEM NINE of the Will, the trustee was required to limit its investments to securities "deemed to be legal investments". In 1928, the term "legal investments" found statutory definition in Section 3875 of the Revised Delaware Code of 1915 which did not permit investment in the common stock of private corporations although it did permit investment in ten types of securities and in "such other securities as may be approved by the Chancellor". Appellant argues that the "legals only" mandate of the Will incorporated the exclusion of Section 3875 and left no area for trustee judgment. The Vice Chancellor agreed that the Hopeton exchange "meant going outside the legal investments listed in Section 3875" but held that the statute was not an absolute bar but merely subjected the trustee to the risk of surcharge in the event the investment proved unwise. Relying upon the principles announced in In Re Cook's Trust Estate, 20 Del.Ch. 123, 171 A. 730 (1934) the Vice Chancellor concluded that the trustee's action was to be tested, not by the statutory classification of the investment, but by whether the trustee's actions conformed to the "prudent man" rule.

In assessing the Trustee's conduct in the Hopeton exchange, the Vice Chancellor dealt extensively with the historical and legal setting in which the proposal was ac-cepted. As the Court noted, the problem of voting control was real, not contrived and the alternatives of relinquishment of voting rights or abandonment of its role as executor-trustee were fraught with financial loss to the estate as well as to the trust. The Court determined that the Hopeton exchange was a reasonable accommodation to the realities of a difficult situation.

■ We agree with the Vice Chancellor that the Hopeton proposal was not, *per se*, an arrangement beyond the authority of the Trustee. While the Will contains a clear admonition to avoid "non legals" in the making of investments, that direction cannot be considered without reference to the singular nature of the holdings of the estate and the statutory standard to which it refers or its judicial interpretation. *In Re Cook's Trust Estate, supra.* Cases involving express prohibitions requiring no reference outside the Will are distinguishable. Equitable Trust Co. v. Snader, 20 Del.Ch. 278, 174 A. 132 (1934); In Re Kelsey's Estate, 393 Pa. 513, 143 A.2d 42 (1958). The overriding considerations in this case render it inappropriate to apply the strict test for which appellant contends.

■ Not only must the trustee deal with trust property with ordinary prudence but he is held to two additional standards: (1) since he is dealing with the property of another for whom he is morally bound to provide, he must avoid even those risks which he might take with his own property and (2) he must take no risk which endangers the integrity of the trust corpus. Wilmington Trust v. Coulter, Del.Supr., 41 Del.Ch. 548, 200 A.2d 441 (1964). It is with regard to the second consideration that we believe the trustee's judgment was not sufficiently scrutinized.

The Vice Chancellor in measuring the trustee's conduct by the prudent man rule determined that Delaware Trust as trustee had authority under the Will to sell or exchange its own shares in such a manner as to avoid disenfranchisement of the shares

and a period of uncertainty in management. The risk inherent in the exchange the Court held, was adequately insulated through a substantial indemnity bond executed by the transferees. While we agree that the wisdom of the exchange must be measured by the exigencies of the moment and not subjected to judicial hindsight, the transaction must be examined to determine if there had been a proper balancing of the interests of the three distinct parties, whose interests do not necessarily coincide: the trustee, the life tenants and the remaindermen. In our view, insufficient consideration was given to protecting the interests of the remaindermen and since, as the Vice Chancellor noted in his opinion, this litigation represents appellant's "day in Court" he is entitled to, at least, an analysis of the merits of the transaction as they affect him.

It should be noted that the Hopeton transaction was indeed an exchange of stock and not a sale, thus lacking an objective standard of measurement such as market value. Indeed, an outright sale of the Delaware Trust shares to a third party while within the trustee's authority would have been defeative of the aim of both negotiating parties—the trustee and the life tenants. Moreover, the testator made clear an intention that the trustee "take and hold * * * any investment securities * * * held by me in my lifetime" presumably with the thought that, barring the need for liquidation, these securities would remain in the corpus of the trust for the benefit of the grandchildren-remaindermen. The Hopeton exchange while it preserved the income and growth features of the Delaware Trust shares stripped the voting rights from the corpus and left them in the complete control of the life tenants who are not accountable to the trustee for the manner in which such voting is exercised.[3]

Each of the negotiating parties to the 1928 exchange benefited from the transaction—the life tenants secured control and the trustee-executor retained its status. Each of these goals was legitimate as long as they were not attained at the expense of the remaindermen's rights. Apparently little consideration was given to the effect of the transaction on the ultimate owners of the Delaware Trust shares—the remaindermen. Clearly, the non-voting shares of Hopeton distributed and to be distributed to the remaindermen are markedly different from the shares placed in the trustee's hands in 1928.

The parties to the Hopeton exchange never reduced to writing their contractual undertakings. The only writings evidencing the transaction are the minutes of the meetings of the Delaware Trust Company's Board of Directors, the Indemnity Bond and the Certificate of Incorporation of Hopeton which contained the following provision:

"ELEVENTH. None of the shares of the capital stock of Delaware Trust Company so held or owned by this corporation as aforesaid shall be sold, transferred, exchanged or otherwise disposed of without the affirmative vote of the holders of a majority of all classes of stock of this corporation then issues and outstanding."

Thus William, as the majority holder of the preferred stock could, and through the 1954 voting trust eventually did, effectively seal into Hopeton the controlling shares of Delaware Trust. There is no indication that the trustee even considered the effect of that provision on the Hopeton common which it was to hold and later distribute to the remaindermen.

The 1954 voting trust established by William is illustrative of the risk which the 1928 exchange held for the remaindermen. While there had been a community interest between the two classes of Hopeton stock as long as the income benefi-

3. While it may be true that certain of the remaindermen have enjoyed the benefit of voting shares, e. g., election to Delaware Trust's Board of Directors, this result is fortuitous and does not flow from the Hopeton exchange since the trustees of the 1954 voting trust have absolute discretion in the voting of these shares.

ciaries were identical with the holders of the voting stock, it was obvious that upon the death of William, the identity would be lost. Yet the testator's intention was that the unity of the stockholdings of the trust was not to extend beyond the lives of the life tenants, since distribution of principal was clearly required beginning with the death of the first life tenant. The 1954 inter-vivos trust prevented the remaindermen from securing the return of their Delaware Trust voting rights.

■■■ It is axiomatic that where there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them. In the words of one authority:

"This principle has its commonest application where there are successive beneficiaries. Where the trustee is directed to pay the income to a beneficiary during his life and on his death to pay the principal to another beneficiary, the interests of the two beneficiaries are to a certain extent antagonistic, and the trustee is under a duty so to administer the trust as to preserve a fair balance between them. He is under a duty to the former beneficiary *to take care not* merely to preserve the trust property but to make it productive so that a reasonable income will be available for him. He is under a duty to the latter beneficiary to take care to preserve the principal of the trust property for him." Scott on Trusts, 3rd.Ed. § 232, Cf; Restatement of Trusts 2d § 232.

Both parties agree that the trustee had the right to sell the Delaware Trust shares outright but appellant argues that the trustee's right to exchange the shares was limited under ITEM TWELVE of the Will to an exchange incident to "reorganization, consolidation, combination, purchase or merger". The trustee argues that a specific power to sell includes the right to exchange the property for shares of stock of a new company formed for that purpose,

relying upon the cases collected at 20 A.L. R.3d 841. While there is no Delaware decision specifically controlling, we agree that the trustee's authority may so extend. But there are limitations inherent in such an exchange where the interests of several beneficiaries may be antagonistic. The better reasoned rule requires Court approval before such an exchange to insure that the interests of different classes of beneficiaries may be closely and impartially examined. Ash v. Ash, 126 N.J.Eq. 531, 10 A.2d 150 (1940). Hillyard v. Leonard, Mo., 391 S.W.2d 211 (1965). Even if the proceedings below were viewed as the equivalent, *nunc pro tunc*, of judicial review of the Hopeton exchange we do not believe the Vice Chancellor gave sufficient consideration to the detriment of the remaindermen which the exchange impended. The Vice Chancellor appeared to gauge potential for damage in terms of "the best interests of their corporation" referring presumably to the grandchildren. Without voting rights the remaindermen's claim to ownership of the corporation must, at best, be considered incomplete.

Nor does the presence of an indemnity bond cure the detriment. Monetary compensation for damages flowing from the unequal treatment of trust beneficiaries may be an adequate remedy in a proper case. Here, recognition must be give to the fact that the particular securities represented controlling interest in a bank which had been developed by William DuPont, Sr., which was located in Wilmington (where most of the members of the family were located) and whose stock was closely held and not traded on a stock exchange. The bond cannot buy voting rights and the difficulty in attempting to measure the market value of Hopeton common compared to unrestricted Delaware Trust voting stock is so manifest as to discourage the attempt. In sum, the trustee's resort to an indemnity bond to protect the interests of the remaindermen falls far short of the fiduciary protection required in this unusual situation.

While the informed consent of the beneficiaries may justify the trustee in proceeding with an exchange of principal, that consent must be clearly evidenced. Reynolds v. Remick, 333 Mass. 1, 127 N.E. 2d 653 (1955); Restatement: Trusts 2d, § 216; Scott on Trusts, 3rd Ed. §§ 214, 216. As previously noted, judicial approval was not sought at the time of the exchange, even though three of the remaindermen were minors and two had not yet been born. Whether a guardian ad litem, appointed at the time, would or could have consented to the exchange we need not decide since one of the remaindermen has now indicated his objection at the first instance for judicial review. The fact that the other remaindermen do not object to the loss of voting rights does not foreclose his claim. In Re Frank's Estate, Surr.Ct., 154 Misc. 472, 277 N.Y.S. 573 (1935). Although he is one of a beneficiary class, appellant's entitlement arises distinctly and independently under his grandfather's Will.

In remanding this matter to the Court of Chancery we do not dictate the remedy which should be fashioned to secure the voting rights of the remaindermen, including appellant.[4] Several alternatives have been suggested by the appellant but the relief to be granted must await the determination by the lower Court of whether, under present law, there is any need to require the trustee to refrain from voting its own shares still subject to the exchange and whether the trustee should be required to seek the impressment of a trust upon the Hopeton preferred which was the subject matter of the 1954 inter-vivos trust. The trustee, of course, is not estopped to question its authority to enter into the exchange. Equitable Trust Co. v. Delaware Trust Co., 30 Del.Ch. 118, 54 A. 2d 733 (1947). Moreover, the Court below granted summary judgment with respect to the affirmative defenses asserted by the defendants but made no findings with respect thereto since the complaint was deemed to be without merit. In remanding this matter, we expressly refrain from commenting upon those defenses and consider them available for adjudication in the Court of Chancery.

We conclude that the decision of the Court of Chancery granting summary judgment in favor of the defendants must be reversed. The matter is remanded to the Court of Chancery for proceedings consistent herewith.

## UPON PETITION FOR REARGUMENT

Appellees seek reargument on several grounds, all of which were considered in our principal opinion and appellees' reassertion is merely argumentative. Two points raised, however, spring from a misapprehension of the Court's holding and, to the extent the Court's language contributes to that understanding, deserve clarification. Appellees' view our principal decision as compelling rescission of the Hopeton transaction. As we noted in our principal decision, the ultimate remedy to restore the rights of the remaindermen must be fashioned by the Vice Chancellor. The nullification of the Hopeton exchange is not necessarily a condition of that restoration although such a procedure might be required. Secondly, we believe it clear that the Vice Chancellor did not pass upon, nor comment concerning, the affirmative defenses asserted by appellees in the Court of Chancery. Our remand renders those defenses viable since the Vice Chancellor's grant of summary judgment on the merits of the complaint, although a final judgment, was not an adjudication in any respect.

We adhere to the original conclusion and deny the petition for reargument.

4. In the Court of Chancery, appellant also sought removal of the trustee. While the trustee in participating in the Hopeton transaction failed to give impartial protection to the interests of the remaindermen, the record does not demonstrate misconduct or self-dealing justifying removal.