ESTATE OF WILLIAM DU PONT, JR., DECEASED, JEAN ELLEN DU PONT MCCONNELL, WILLIAM S. POTTER, AND DELAWARE TRUST COMPANY, AS EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2926–70. Filed March 31, 1975.

*Gordon W. Gerber* and *Leonard S. Togman,* for the petitioners.
*Albert Squire,* for the respondent.

OPINION

RAUM, *Judge:* 1. *Section 2036 issue.*—Although there is a superficial similarity in respect of the facts relating to the Hall, Inc., and Point Happy properties, there are nevertheless important differences between them. In the circumstances we consider each of them separately.

(a) *Hall, Inc.*—Insofar as the Hall, Inc., property is concerned, the relevant sequence of events is as follows: Decedent organized Hall, Inc., a corporation owned entirely by him, to which he then transferred the "horse farm" portion of Bellevue Hall, a residential estate also owned by him. Shortly thereafter he leased the property from Hall, Inc., for a term of 10 years with an option to renew for successive 10-year periods. The rental was not based upon the fair market value of the property—its highest and best use being for real estate development—but was correlated to a much lower figure (between a third and a fourth of the fair market value of the property) based upon its use as a "horse farm." He then transferred without reservation the entirety of Hall, Inc.'s stock to a newly created trust for the benefit of his offspring. At issue is whether decedent's leasehold interest in that portion of Bellevue Hall held by Hall, Inc., amounted in substance to such retention of the property as would require its inclusion in his gross estate by reason of section 2036(a)(1) of the Internal Revenue Code, the pertinent portion of which follows:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, or

It is the Commissioner's contention that inasmuch as decedent in fact had both the possession and enjoyment of all of Bellevue Hall continuously from times prior to the transfer of the property to Hall, Inc., and the creation of the trust until the time of his death, he literally "retained * * * the possession or enjoyment" of the Hall, Inc., property for a period which did "not in fact end before his death." In support of his position, the Commissioner argues that the lease through which decedent retained possession vastly understated the property's true rental value, an indication that the entire arrangement lacked substance.

Petitioners respond that the only property relevant to the operation of section 2036(a)(1) is the *stock* of Hall, Inc., all of which decedent transferred to the trust without retaining any residual use or enjoyment thereof whatsoever. Alternatively, in respect of the real estate which decedent transferred to Hall, Inc., petitioners maintain that decedent subsequently reacquired possession solely by virtue of the payment of a fair market rent under the lease, and that such a *purchased* interest overrides and thereby precludes the existence of a *retained* interest as contemplated by section 2036(a)(1). We, however, are persuaded that in the circumstances of this case decedent did in substance retain a life estate (or interest which did not in fact end before his death) described by section 2036(a)(1) in the Hall, Inc., property.

Section 2036, the statutory descendant of section 811(c)(1)(B) of the 1939 Code, embodies a policy of comprehensive estate taxation directed at those lifetime transfers which are "essentially testamentary—i.e., transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime." *United States v. Estate of Grace*, 395 U.S. 316, 320. See also *United States v. O'Malley*, 383 U.S. 627, 630–631; *Guynn v. United States*, 437 F. 2d 1148, 1150

(C.A. 4); *Estate of Harry H. Beckwith,* 55 T.C. 242, 247. The broad language of the statute operates to increase the decedent's gross estate by the inclusion of the value of property which has been the subject of an inter vivos transfer whenever the decedent has "retained" an interest in the property and "the ultimate possession or enjoyment of which is held in suspense until the moment of the decedent's death or thereafter." *Goldstone v. United States,* 325 U.S. 687, 691, quoted in *Commissioner v. Estate of Church,* 335 U.S. 632, 646, and in *McNichol's Estate v. Commissioner,* 265 F. 2d 667, 673 (C.A. 3), affirming 29 T.C. 1179, certiorari denied 361 U.S. 829. The Supreme Court, in applying section 811(c)(1)(B) of the 1939 Code, strictly circumscribed the type of transfer which can escape the reach of that section. *Commissioner v. Estate of Church,* 335 U.S. at 645-646:

an estate tax cannot be avoided by any trust transfer except by a bona fide transfer in which the settlor, absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property. After such a transfer has been made, the settlor must be left with no present legal title in the property, no possible reversionary interest in that title, and no right to possess or to enjoy the property then or thereafter. In other words such a transfer must be immediate and out and out, and must be unaffected by whether the grantor lives or dies. * * *

It is apparent to us that on the facts before us decedent's undisturbed enjoyment of the Hall, Inc., property until the time of his death is irreconcilable with the type of unqualified transfer demanded by section 2036(a)(1).

The altogether evident fact on this record is that Bellevue Hall, both prior and subsequent to the creation of Hall, Inc., comprised a single, integrated property used for residential, recreational,[2] and possibly other purposes. Notwithstanding decedent's attempt to carve out what was ostensibly a residential enclave in the midst of his family's estate, there can be little doubt that the entirety of Bellevue Hall continued to serve as his residence with its related facilities. There is nothing in the record to suggest otherwise, and every reasonable inference

[2] In using the term "recreational" we do not necessarily include the training of racehorses, nor do we mean to pass upon the question whether the training of racehorses constituted the conduct of a "trade or business" as distinguished from a "hobby." Plainly, however, it may fairly be inferred that the activity was one from which decedent derived personal satisfaction and which he found it convenient to be carried on adjacent to his residence and various recreational facilities.

confirms that decedent's enjoyment of Bellevue Hall in toto continued unabated until the time of his death.

Our understanding of decedent's relationship to and enjoyment of Bellevue Hall (inclusive of the Hall, Inc., portion) is incompatible with a conclusion that, by a series of title conveyances alone, decedent could remove a part of Bellevue Hall from his gross estate. It is axiomatic in matters of taxation generally, and particularly with respect to intrafamily arrangements of the sort before us, that the law must respond to the operative effect of a transaction regardless of its form; the simple passage of legal title to a trustee does not necessarily constitute a transfer which can survive the careful scrutiny demanded by section 2036(a)(1). *Commissioner v. Estate of Church*, 335 U.S. 632, 644. Cf. *United States v. Estate of Grace*, 395 U.S. 316, 323; *In Re Estate of Bomash*, 432 F. 2d 308, 311 (C.A. 9), reversing 50 T.C. 667; *Skinner's Estate v. Commissioner*, 316 F. 2d 517, 520 (C.A. 3); *Estate of Marie J. Nicol*, 56 T.C. 179, 182; *Estate of Emil Linderme, Sr.*, 52 T.C. 305, 309.

Upon consideration of the whole record, we are firmly convinced that the series of legal steps, beginning with the creation of Hall, Inc., on June 30, 1961, and concluding with the transfer of its stock in trust on January 2, 1962, comprised a single device, wholly lacking in substance, by which decedent attempted to divest himself of title to the property without relinquishing his possession or enjoyment thereof. This is, of course, not to say that had decedent conveyed the property to Hall, Inc., and then leased a separate but similar piece of property in its stead, such leased property would necessarily be includable in his gross estate. But here we are considering a unique piece of property which, in conjunction with decedent's principal residence, comprised a single, integrated unit, the possession of which property he had enjoyed for years past and the lease for which he negotiated with his wholly owned corporation—a lease so structured that it hardly reflected the kind of bona fide transaction that would have been entered into by parties dealing with one another at arm's length. The independently appraised value of the property, assuming its highest and best use for a combination of residential subdivision and commercial enterprise, was approximately $1,200,000. We have very little doubt that an independent owner would have been completely

unwilling to enter into such a comparatively long-term lease the rent for which was predicated upon its substantially diminished value as a "horse farm." Indeed, one of petitioner's valuation experts admitted that he, as owner, would not have entered such a lease without a clause permitting him to terminate it prior to its natural expiration. We do not suggest that an owner of property suitable for real estate development would not enter into a bona fide lease at a rental based upon a considerably lower fair market value in an effort to salvage as much as he can prior to the exploitation of the property for its highest and best use. The vice in the arrangement before us is that the "salvage" rental based on the substantially lower fair market value of the property as a "horse farm" is coupled with a lease term that tied up the property at that rental and for that purpose for a period of years beyond that which would be acceptable in a bona fide transaction without a termination clause. We are fully satisfied that in the circumstances of this case the lease cannot be treated as a bona fide arrangement at a fair rental, and that our view of the substance of what is before us must not be obscured by that lease. Moreover, the substance is clear: The decedent continued to have the possession and enjoyment of the entire Bellevue Hall estate (including the Hall, Inc., property) for a period which did not in fact end before his death, thus bringing this case within the terms of section 2036(a)(1).

The Supreme Court's decision in *United States v. Byrum,* 408 U.S. 125, to which petitioners direct our attention, is wholly inapposite in the circumstances of this case. There the decedent, who owned a majority of the shares of stock of three corporations (which had a substantial number of unrelated minority stockholders) irrevocably transferred in trust a portion thereof (less than 50 percent of the outstanding shares in each corporation) but retained the voting rights in such transferred shares. In the case of two of the corporations his voting rights in the shares not transferred when combined with the retained voting rights in the transferred shares exceeded 50 percent, and in the case of the third corporation his voting rights in the shares not transferred alone exceeded 50 percent. The Court held that the mere retention of the majority voting rights in the circumstances of that case did not of itself bring it within the scope of section 2036(a)(1) solely on account of the corporate control which thus remained with the decedent. The instant case

presents quite a different kind of situation. By reason of our evaluation of the evidence in the present case, we have disregarded the arrangement with Hall, Inc., which we have found to be lacking in bona fides, and we therefore do not need to consider the hypothetical effect of interposing a corporation with a different arrangement between decedent and his residential estate.[3] Accordingly, our view of decedent's arrangement with Hall, Inc., undercuts entirely the significance of factors otherwise thought to indicate the existence of a transfer to which section 2036(a) is inapplicable. Thus, it is quite beside the point that decedent paid some, albeit inadequate, "rent" to Hall, Inc., or that decedent paid money for the reconveyance of title to a small portion of the property. The Hall, Inc., property, along with the remainder of Bellevue Hall, continued to be available to decedent continuously until his death for residential, recreational, and other purposes. This is precisely the situation to which section 2036(a)(1) speaks, on account of which we hold that the value of the Hall, Inc., property is includable in decedent's estate.

(b) *Point Happy.*—While the facts surrounding the Point Happy property resemble those relating to the Hall, Inc., property, they differ in several key respects. The decedent himself never owned the Point Happy property. Shapdale, decedent's wholly owned corporation, formed Point Happy which thereupon purchased the property, a date ranch, from an unrelated party. About 10 years later Point Happy leased the property to decedent, but unlike the Hall, Inc., lease the rental appears to have been based upon the full fair market value of the property. Shortly thereafter, Shapdale sold the Point Happy stock to decedent, whereupon he transferred it to a newly created trust for the benefit of his offspring. As in the case of the Hall, Inc., property, the issue here concerns the applicability of section 2036(a)(1) to the property, and the parties' respective positions parallel those assumed in respect of that issue. Although the result is not free from doubt, we are satisfied that a decision in favor of petitioner is warranted.

Despite the similarity of the Point Happy and Hall, Inc., arrangements, the differences are significant. Unlike the Bellevue

---

[3] *Estate of Roy D. Barlow,* 55 T.C. 666, also relied upon by petitioner, is distinguishable. That case turned upon its special facts and the Court's treatment of the rental there involved as a "fair rental." We do not find that the rental in the context of the facts of this case was "fair," and we reach a different conclusion here on a quite different record.

Hall situation, decedent had no connection with the property whatsoever prior to its purchase by Point Happy. Furthermore, the record is wholly silent as to whether decedent thereafter occupied the property or used it otherwise for vacation, recreation, or other personal purposes. Nor is there any evidence that the property was used differently after the execution of the lease than it had been prior thereto. Moreover, it appears from all the evidence that the lease bore a fair rental, based upon the opinion of an independent appraiser. And while the 10-year term with an option to renew for successive like periods is troublesome, it is more reasonable than in the case of the Hall, Inc., property since the rental here represented an adequate return on the fair market value of the property. We find—although without strong confidence—that the lease is one which adverse parties acting at arm's length might have entered into.

Accordingly, we are not inclined to hold that decedent "retained * * * the possession or enjoyment of" the Point Happy property (or an interest therein) for a period which did not in fact end before his death. Rather it appears that by transferring the Point Happy stock to the trust decedent completely divested himself of all interest, direct or indirect, in the property, retaining none of the taxable incidents of ownership. This is not altered by the existence of the lease, which displays the earmarks of a bona fide transaction of the sort adverse parties might enter into. In the absence of any evidence tending to establish the unique value of the property to decedent, the situation strikes us as most like that which would have existed had decedent completely divested himself of his direct or indirect interest in the Point Happy property and then rented another similar piece of property. Certainly in that case there would be no question of estate taxation, and we are satisfied that a like result is proper here. We conclude that the value of the Point Happy property is not includable in decedent's estate.

2. *Hopeton Holding Corp. preferred stock.*—At the outset, we find it helpful to summarize the facts giving rise to this issue. Decedent's father, William du Pont, Sr., died on January 20, 1928, and by his will left the bulk of his estate, including 5,825 shares of Delaware Trust stock, in trust with Delaware Trust. The 5,825 shares represented 58.25 percent of its outstanding stock. After the payment of certain annuities not important here, the trustee was directed to distribute the net income of the trust

to William du Pont, Sr.'s son (decedent herein) and daughter in amounts equaling 60 and 40 percent, respectively. Upon the death of each life tenant, his or her respective portion was to be distributed "in equal shares, to and among all my grandchildren who may then be living and the issue then living of any deceased grandchild of mine."

On account of certain difficulties occasioned by Delaware Trust's role as trustee of a majority of its own stock, it was shortly thereafter arranged for the trust to exchange the 5,825 shares of Delaware Trust stock for an equal number of nonvoting common shares of Hopeton, a corporation to be created for this purpose. The voting control of Hopeton (and, hence, of Delaware Trust) was vested in 10 shares of preferred stock with minimal equity interest, 6 of which shares were distributed directly to decedent and 4 to his sister. She thereafter gave her shares to decedent. This arrangement effectively divorced the equity interest in Delaware Trust, which the Hopeton common represented, from the voting control which resided with decedent in the form of the Hopeton preferred stock.

In 1954 decedent placed all 10 voting shares of Hopeton preferred stock in a revocable trust, to continue until 20 years after the death of certain of his grandchildren unless terminated earlier by the trustees. At the time of decedent's death, all 10 shares of Hopeton preferred were still held in trust. Upon termination, the trustees are required to deliver the Hopeton voting shares free of trust "unto such of the Trustor's descendants then living as a majority of the then acting Trustees, in their uncontrolled discretion, shall deem to be best qualified to receive and administer the assets then comprising the trust fund."

Since the 1954 trust was revocable, there is no dispute that any property transferred to it by the decedent, of which he had the power of disposition, is properly includable in his gross estate.[4] The issue litigated by the parties was the fair market value of

---

[4] SEC. 2038. REVOCABLE TRANSFERS.

(a) IN GENERAL.—The value of the gross estate shall include the value of all property—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

that property—i.e., the 10 shares of Hopeton preferred. And the principal, if not the only, matter in dispute was the extent to which, if any, that fair market value should reflect an element of value to be attributed to the control over Delaware Trust as a result of the voting power inhering in the Hopeton preferred. The valuation experts at the trial differed widely as to the effect that such control would have upon the fair market value of the Hopeton preferred. However, we need not make any finding in this respect, because we are convinced by petitioner's alternative argument that, whatever control the decedent may have had during his lifetime over Delaware Trust through his ownership of the Hopeton preferred, he had nothing in respect of such control that he could have disposed of at his death (or, for that matter, prior to his death) to the disadvantage of the remaindermen of the trust established under the will of his father, William du Pont, Sr.

By the terms of their father's will, decedent and his sister were entitled to receive the income from the trust assets held by Delaware Trust (subject to the specified annuities) for the duration of each of their lives. During that period it was necessarily contemplated that the Delaware Trust stock would remain as a single block in trust. It is equally evident from the requirement that the trust's corpus be distributed upon the death of each income beneficiary that William du Pont, Sr., did not intend that his children's interest therein extend beyond their lives. Clearly decedent and his sister received no more than life estates in the Delaware Trust stock, at the conclusion of which the remaindermen, their children, were entitled to receive it in its entirety.

At the risk of belaboring the obvious, we must stress that, as life tenants, decedent's, as well as his sister's, entire interest in the Delaware Trust stock absolutely terminated upon each of their deaths. And absent the concurrence of the remaindermen, no agreement with the trustee, including the Hopeton exchange, could expand their interests beyond death at the expense of the remaindermen. Thus, whereas the Hopeton exchange itself may well have been within the authority of the trustee, decedent's interest in the Hopeton preferred stock, to the extent that he controlled the voting rights of the 5,825 shares of Delaware Trust stock, was nonetheless that of a life tenant. As such he had the power to make neither a testamentary disposition thereof nor an

inter vivos transfer for a period in excess of his own life. Obviously, this conclusion was not altered by decedent's unilateral action of placing the Hopeton preferred stock in a revocable trust the life of which extends beyond his own death. Decedent's entire interest in the control over Delaware Trust reflected in the rights conferred by the Hopeton preferred stock and, likewise, the interest of the 1954 revocable trust to that extent ended with his death on account of which the Hopeton preferred possessed no value in respect of such control includable in decedent's gross estate.

Even if we were less sure of our conclusion in this respect than we are, the nature of the decedent's rights has been authoritatively determined in an adversary proceeding by the Supreme Court of Delaware in *W. Henry du Pont v. Delaware Trust Co.,* 320 A. 2d 694 (Del. 1974), rehearing denied (May 13, 1974), and its decision in this connection must be accepted by us as binding. A "State's highest court is the best authority on its own law." *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465. The litigation in the Delaware courts has been recounted in our findings and need not be restated here. By its decision the Supreme Court of Delaware in effect held that any benefits inhering in the Hopeton preferred stock to the extent of control over Delaware Trust passed at the decedent's death to the remaindermen of the trust created by William du Pont, Sr., the decedent's father. In substance, in respect of the Hopeton preferred, the decedent had nothing over which he had the power of disposition that could affect the control over Delaware Trust after his death. His right of control existed only during his lifetime, and that right was no greater than that of a life tenant, which for that reason is plainly not includable in his gross estate. See Rev. Rul. 66–86, 1966–1 C.B. 216. We decide this issue for petitioner.

Since there did not appear to be any real dispute between the parties as to the value of the Hopeton preferred when stripped of any power of control over Delaware Trust, we will not assume that, apart from any such element of control, they will be unable to agree upon a value for the stock in the

*Decision to be entered under Rule 155.*