### In the Matter of the ESTATE of William duPONT, Jr.

Court of Chancery of Delaware, New Castle.

Submitted Jan. 31, 1977.

Decided April 20, 1977.

---

Joseph H. Geoghegan and Daniel F. Lindley of Potter, Anderson & Corroon, Wilmington, for the executors of the Estate of William duPont, Jr., petitioners below, cross appellants.

Lawrence M. Sullivan and Frederick T. Haase, Jr., Wilmington, for Henry E. I. duPont and Martha Verge duPont, guardians, respondents below, appellants.

Henry N. Herndon, Jr., Wilmington, guardian ad litem.

MARVEL, Chancellor:

William duPont, Jr., then a divorced man resident in Brandywine Hundred, died on December 31, 1965 leaving three sons and two daughters, a number of grandchildren, a will executed on June 19, 1964, and an estate having an estimated adjusted gross value in excess of $33,000,000, an interest in a trust set up in his father's will having terminated on his father's death, and the principal from which decedent's proportionate lifetime interest in the corpus of such trust had been derived having been distrib-

uted among his children. It plays no direct part [1] in the resolution of the matter before the Court, namely an appeal and cross appeal from the order of the Register of Wills dated August 26, 1976 which allowed additional compensation to the executors of the William duPont, Jr., estate, namely Jean Ellen duPont McConnell, his daughter, William S. Potter, his close friend and attorney, and Delaware Trust Company for which he had served as president for more than forty years, in addition to that called for in his fee schedule. Decedent's will was silent on the subject of what compensation the executors of his estate were to receive. At common law service of the personal representative of an estate was purely honorary. Later, he became entitled to the personal estate remaining after payment of expenses, debts and legacies. See *In re Spicer's Estate* (Del.Orph.Ct.), 13 Del.Ch. 430, 120 A. 90 (1923).

Such additional compensation, which was based on the size of the estate, pertinent precedents, the nature of and the necessity for the services rendered, the benefits bestowed, and the time expended viewed in light of the commissions previously allowed on the first accounting in 1967, namely $590,785.78, was fixed at $330,000. Because of the complexity of the estate, annual accounts were not filed by the executors between the years 1967 and 1976 as required by 12 Del.C. Sec. 2301. No exceptions or appeals were taken from such 1967 allowance, and none, in my opinion, can be taken now.

The Register's fee schedule, on the other hand, now calls for the allowance of a fee of $60,000 on the accounting here in issue on the basis of the sum of $2,400,000 received by the estate since the filing of the first account in 1967. The executors had sought an additional allowance of $500,000 and renew such application on this proceeding de novo, *Nardo v. Nardo,* Del.Supr., 209 A.2d 905 (1965); *In re Will of Collins,* Del.

---

1. However, decedent's estate may ultimately be held liable on the $900,000 indemnity bond entered into by him and his sister after the death of their father in connection with the Hopeton

exchange, See *duPont v. Delaware Trust Company,* Del.Ch., 310 A.2d 915 (1973) rev., Del. Supr., 320 A.2d 694 (1974), on remand and reargument, Del.Ch., 364 A.2d 157 (1976).

Supr., 251 A.2d 345 (1969), and 57 Laws of Delaware, Ch. 402 Sec. 4. The granting of an additional allowance on the basis of the factors noted below is a proper prerogative of the Register of Wills and of this Court, *In re Walker's Estate,* 13 Del.Ch. 439, 122 A. 192 (1922); *In re Brown's Estate,* 28 Del.Ch. 562, 52 A.2d 387 (1944), and III Scott on Trusts 3rd ed. Sec. 242.2. Opposing the executors' application and arguing that the maximum compensation now allowable to them is the amount called for in the Register of Wills' schedules are the guardians of the minor children of decedent's son Henry E. I. duPont and the guardian ad litem for the minor and unborn issue of the decedent other than the issue of Henry E. I. duPont.

The basis for the executors' present application is the alleged complexity of the decedent's estate, the administration of which has already extended over ten years with many ramifications, including the liquidation of leasehold interests in lands owned by family owned corporations, the operation of Shapdale, Inc., and the maintenance of Bellevue Hall. However, there was a substantial liquid aspect to the estate and insofar as tax problems were incurred, and there were many, the executors were represented by competent counsel.

At the time of the first accounting of the executors total commissions were routinely allowed them in the amount of $590,785.78 out of which William S. Potter received $196,928.59 and the Delaware Trust Company $393,857.19, while Mrs. McConnell with the interests of her sister and brothers in mind elected not to receive, as it were, a disproportionate share of her father's estate as a result of her services as an executor of his estate,[2] received nothing. Compare *In Matter of Ernest duPont Trusts,* Del.Ch., C.M. 2698, Memorandum Opinion, March 25, 1977. Of the three executors, only Mr. Potter kept an orderly time record of his some 1,000 hours devoted to the settlement of the

duPont estate. All of the executors now contend, however, that they have separately devoted a total of over 21,600 hours to the still incomplete winding up of the duPont estate, their duties as executors, as in all cases, being the collection of assets, the payment of debts of the decedent and the distribution of the balance of the estate to the persons entitled thereto, *Theisen v. Hoey,* 29 Del.Ch. 365, 51 A.2d 61 (1947).

In the first accounting of the executors of the duPont estate, which was filed some fourteen months after decedent's death, such estate was reported as consisting of shares in twelve publicly held corporations having a value of $5,679,702, treasury bills having a value of $11,324,829, municipal bonds having a value of $3,000,000, debts due the estate from closely held corporations in the amount of $1,523,991, and finally stock of Shapdale, Inc. the corporation which owned and operated the Delaware Trust Building and Hercules Tower with an estimated value of $7,990,086.

The most pressing matters confronting the executors as the year 1966 dawned and which occupied them during the ensuing month or two was the preparation for and sale of decedent's brood mares, colts and fillies as well as stud, involving what Mrs. McConnell termed "slave labor", the sale of a herd of Santa Gertrudis cattle (both thoroughbreds and cattle sold at prices in excess of their appraisal), the disposal of properties owned by closely held corporations as to which the decedent held leasehold interests extending in one case to 1972, such properties being situate in California, Maryland, Virginia and Delaware, trips to which were often required, particularly by Mrs. McConnell, who, in her own words, did the "leg work," and finally the release of the estate from a contract for the construction of a massive and expensive dam on the Fair Hill property. Furthermore, although it had been left to the trustees[3] named in the decedent's will to be held until decedent's son, William duPont III, should reach the age of twenty-one and an opportunity afforded first to him and then to his sisters

---

2. "I waived because I didn't wish to take anything more from my father's estate than the rest of the children would receive", McConnell deposition pps. 19 and 20. She intends to

share in such commissions as may now be allowed.

3. The same as his executors.

and brothers in order to purchase same, the executors, especially Mrs. McConnell, concerned themselves with the maintenance of Bellevue Hall, the decedent's domicile, not only as a storehouse for but a place to make a painstaking inventory of the decedent's large and unusual collection of personal property to be later divided among his children in compliance with the decedent's instructions to the trustees of his estate. Significantly, although Mrs. McConnell did much of the leg work not only in connection with livestock but with making inventory of personal property, the Philadelphia firm of Samuel Freeman and Company was employed for appraisal and sale purposes. Other professional assistance was also enlisted for the tedious task of making lists, appraisals and inventories.

And while it appears to be the general rule that when an estate is administered by more than one person, such persons should not receive more than what a single representative would have been entitled to, 3 Woerner, The American Law of Administration, (3rd ed.) Sec. 530, I am of the view that in an estate as diverse as that of the decedent's, the livestock and agrarian aspects of which only the daughter, Mrs. McConnell, was closely and deeply knowledgeable, that it was not unreasonable for the decedent, in planning for the settlement of his contemplated large and diverse estate to call on the collective skills of his friend and attorney for at least fifteen years, the bank which had been established by his father and of which decedent had served as president for more than forty years, and his elder daughter, who shared with him not only his business interests but an interest in horses as well as in the decedent's favorite sport, with the possible exception of lawn tennis, namely fox hunting. Significantly, he bequeathed to her his hunters, their tack, and his pack of hounds. Compare *Hayward v. Plant*, 98 Conn. 374, 119 A. 341 (1923). Furthermore, because the executors and trustees of the duPont estate are the same persons, it is difficult and perhaps useless to try to draw a sharp line between their respective fields of duty.

On the other hand, I am of the opinion that the executors devoted excessive time to the affairs of Shapdale, the owner of the Delaware Trust building and Hercules Tower, continuing actively to manage it at a time when the estate's interest in the corporation had diminished to 12% instead of looking to such corporation's board and management for the responsibility for such supervision, *Lehman v. Kairys*, 217 Md. 359, 142 A.2d 546 (1958).

The executors, in support of their application, point to the innumerable meetings held by them in connection with tax audits of the decedent's taxable income extending as far back as the year 1961, the successes gained by the executors in such audits, and the successful litigation over the proposal of the Internal Revenue Service to add $10,000,000 to the decedent's taxable estate by including the claimed value of his ten shares of Hopeton Holding Corporation preferred stock as an estate asset. Had such inclusion succeeded, it is contended, the estate would have been rendered insolvent. It must be noted, however, that a total of $562,441.39 in attorneys' fees and disbursements was paid by the estate for services concerned with such audits, the Hopeton preferred stock tax question, the Hopeton exchange litigation in this Court, the pension plan for decedent's employees, and the cancellation of the Fair Hill dam contract. In addition, more than $150,000 was paid by the executors for estate office personnel and accountants' fees, and there were, of course, other expenses, such as the fees of Samuel Freeman and Company of Philadelphia, appraisers and auctioneers. Finally, in my opinion, an individual executor, who, as it were, serves under judicial supervision may not directly seek compensation for services performed by his associates. Compare *Gibbons v. Schenley*, C.A. 3746, Memorandum Opinion, June 15, 1975.

I conclude that the additional compensation allowed the executors of the estate of William duPont, Jr. by the Register of Wills is excessive. Such allowance will be reduced and total compensation allowed in the amount of $100,000.

An appropriate form of order may be presented on notice.